### DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| **UNITED STATES OF AMERICA,**      ) | |
| ) | |
| **Plaintiff,**      ) | |
| ) | |
| **v.**      ) | **Case No. 3:20-cr-0046** |
| ) | |
| **CHRISTOPHER LLOYD TURNBULL,**      ) | |
| ) | |
| **Defendant.**      ) | |
| ) | |

APPEARANCES:

**Gretchen C.F. Shappert, United States Attorney**
**Kyle Payne, AUSA**
United States Attorney's Office
St. Thomas, U.S.V.I.
    *For the United States of America,*

**Matthew A. Campbell, Federal Public Defender**
**Kia Danielle Sears, Assistant Federal Public Defender**
Office of the Federal Public Defender
St. Thomas, U.S.V.I.
    *For Christopher Lloyd Turnbull.*

### <u>MEMORANDUM OPINION</u>

**MOLLOY, C.J.**

    **BEFORE THE COURT** is Defendant Christopher Lloyd Turnbull's ("Turnbull") Motion to Suppress Statement, filed on January 4, 2021. (ECF No. 18.) The United States (the "Government") filed an opposition on January 15, 2021. (ECF No. 20.) In his reply, Turnbull requested that the Court hold his motion to suppress in abeyance due to some of the issues being potentially foreclosed by *United States v. Baxter*, 951 F.3d 128 (3d Cir. 2020), which was at the time on petition for writ of certiorari to the Supreme Court. After the Supreme Court denied the certiorari petition in *Baxter v. United States*, 141 S. Ct. 1269 (2021), the Court scheduled this matter for an evidentiary hearing on the motion to suppress on May 20,

*United States of America v. Turnbull*
Case No.: 3:20-cr-0046
Memorandum Opinion
Page 2 of 21

2021.[1] After listening to the testimony of the witnesses and in consideration of the arguments of counsel, the Court will deny the motion.

## I. FACTUAL BACKGROUND

The Court finds the relevant facts as indicated below based on the testimony adduced during the course of the evidentiary hearing. The Court heard testimony from two witnesses for the Government: Customs and Border Patrol ("CBP") Officer Shawn Brady ("Officer Brady") and Homeland Security Investigations ("HSI") Special Agent Christopher Ramnes ("Agent Ramnes"). Defendant Turnbull did not call any witnesses.

On November 11, 2020, Turnbull arrived at the Cyril E. King Airport on St. Thomas, U.S. Virgin Islands, on an American Airlines flight from Charlotte, North Carolina, with a rolling carry-on suitcase and small black bag. Officer Brady testified that he and CBP Officer Jerry Quetel ("Officer Quetel") were conducting inspections of luggage that day. Based on a review of the flight manifest, the Intel Unit had communicated interest in Turnbull and had identified him for inspection.[2]

---

[1] The Court permitted Turnbull to attend the evidentiary hearing remotely via Microsoft Teams. However, due to technical difficulties, the Court rescheduled the suppression hearing from April 22, 2021, to May 20, 2021.

[2] Officer Brady first testified, on cross-examination, that the CBP had not flagged Turnbull for an inspection prior to his arrival. *See* Hr'g. Tr. at 14:18-25 – 15:1-6. On redirect, Officer Brady changed his testimony:

> Q.   And before you do inspections, do you ever review any information that is related to the incoming flight?
>
> A.   On occasions we do. We—sometimes we can just go out and choose a particular flight, or sometimes we receive flight manifests from different airlines, and we do review manifests. That's another way we can conduct those inspections, by reviewing the manifest for the flight which shows, you know, the passengers coming in, and cargo, baggage. Everything that the flight is bringing into the Virgin Islands usually is on the manifest. Yes.
>
> Q.   Do you recall whether you may have had any information related to Mr. Turnbull that made you interested in him?
>
> A.   Now that I reread the report—based on the review of the manifest, the Intel Unit was interested in Mr. Turnbull.

*Id.* at 38:17-25 – 39:1-8.

After Turnbull's flight landed and he processed through the National Guard arrival checkpoint, Officer Brady approached Turnbull in the baggage claim area and asked him a few general questions about his travel plans in St. Thomas. Turnbull said he was coming to St. Thomas for a short vacation and would be staying at the Starz Hotel. The officers told Turnbull that he had been selected to undergo a baggage inspection, and that he needed to accompany them. Officer Brady testified that the inspection, which would typically take place on the tarmac, was moved to an indoor area known as "hard secondary" because it was raining that day. Turnbull was hesitant and asked them questions as they walked to hard secondary, but Officer Brady explained this was a routine inspection. Once in hard secondary, the officers asked Turnbull to put his belongings on top of the table for inspection.

Turnbull complied with the request "after he asked some more questions" of the officers. *Id.* at 9. In response, Officer Brady told Turnbull that he would be "free to go on his way," *id.* at 9:9-10, after they inspected his bags. Turnbull then asked, "How am I going to be 'on my way' if you guys find something in my bag?" Hr'g Tr. at 9:11-12, ECF No. 61. The officers did not reply to his question. Turnbull put the bags and his personal belongings on the table and Officer Brady instructed Turnbull to have a seat. The officers then gave Turnbull a customs form to fill out and sign before proceeding with the inspection.

Following Turnbull's completion of the form, Officer Brady asked him four questions that CBP officers routinely ask passengers undergoing inspection, as a "binding declaration," *id.* at 10: (1) "Is this your bag?"; (2) "Did you pack the bag yourself?"; (3) "Is there anything sharp inside the bags, like knives or anything that might harm us if we, you, know, touch them?"; and (4) whether Turnbull was "carrying anything for anyone else." *Id.* at 10:6-10.

Turnbull told the officers that someone gave him the roller bag but stated that the other bag was his.

The officers proceeded with the inspection after obtaining Turnbull's binding written and oral declarations. Upon opening the roller bag in Turnbull's possession, the officers discovered there was a black trash bag covering the contents of the bag. *Id.* at 10:22-23. Underneath the trash bag were white t-shirts packaged as if they were new; and under the t-shirts were "some bundles of green leafy substance." *Id.* at 11:2-3.

When the bundles field-tested positive for marijuana, the officers contacted the CBP supervisor on duty and then notified HSI Agent Ramnes "that they had a gentleman down in secondary who came off of a flight, [and] that had . . . what they believed to be a controlled substance in a carry-on luggage." *Id.* at 41:17-20. The officers then "conducted a routine pat down of [Turnbull]," *id.* at 13:21,[3] weighed the bundles, and secured the evidence, *id.* at 12:1-2. Officer Brady testified that he did not ask any questions of Turnbull after discovering the alleged marijuana, but he let Turnbull "know that someone else, another agent, would be coming to the airport to speak with him." *Id.* at 12:8-9. Upon cross examination, Officer Brady testified that he wrote a brief narrative of the seizure—"what was seized, who it was seized from, where it was coming from"—the day of Turnbull's inspection, but he did not take concurrent notes to commemorate all of his interactions with Turnbull. As such, Officer Brady relied solely on his memory for his testimony. *Id.* at 30:5-25, 31:1-7.

Officer Brady also told Turnbull that he should let the officers know if he needed anything. Turnbull then asked to make a phone call. Although personal phone calls are not

---

[3] *See also* Hr'g. Tr. at 25:8-9, ECF No. 61.

normally permitted, Officer Brady told him he would allow a call but "it would have to be on
[the] government landline and it would have to be on the speakerphone." *Id.* at 12:17-18.
Turnbull decided he wanted to make the call, which he proceeded to do over speakerphone
through the government's landline in the presence of the officers. Agent Ramnes also
testified that Officer Brady told him that Officer Brady had allowed Turnbull to make a call
to a woman believed to be Turnbull's girlfriend and that the call was made on the
government landline, on speakerphone.

In all, Officer Brady estimated that his interaction with Turnbull lasted approximately
an hour to an hour and a half. Officer Brady further testified that Turnbull's demeanor was
normal and calm, and that Turnbull was not handcuffed. Officer Brady testified that after
Turnbull made the phone call, the officers did not ask Turnbull any more questions until
Agent Ramnes' arrival.

About thirty to forty-five minutes after Officer Brady's interview with Turnbull
concluded, HSI Special Agents Ramnes and Kean arrived at the airport. *Id.* at 28:2-6. Agent
Ramnes testified that upon arrival he went to the CBP office "to speak with the officer that
made contact with Mr. Turnbull to find out exactly why I was there." *Id.* at 42:7-9. The agents
then went to hard secondary, where Agent Ramnes introduced himself to Turnbull and
began his interview by getting some biographical information from Mr. Turnbull, such as
asking if he still lived at the address on his driver's license. Agent Ramnes then read Turnbull
his *Miranda* warnings before turning to questions about the topic of his investigation. Agent
Ramnes testified that he attempted to record the interview but realized afterward that the
recorder had not worked. *Id.* at 53:3-10.

Agent Ramnes had two identical *Miranda* waiver forms, and he asked Turnbull to read one while he read from the other. Agent Ramnes testified that he then "got confirmation that [Turnbull] understood those rights" and then, once Turnbull "decided that he wanted to speak with us, he signed his name." *Id.* at 43:20-23. The Government introduced the *Miranda* waiver form, bearing the signatures of Turnbull and both agents, into evidence at the hearing. Gov't Ex. 1; *see* ECF No. 20-1.

Agent Ramnes testified that the interrogation took place in the same room as the inspection—hard secondary—where at least one CBP officer was in the back of the room to observe the evidence since HSI had not yet taken possession of it. Agent Ramnes further testified that the interview was cordial, and the agents did not make any threats or promises to Turnbull. Both agents were dressed in plain clothes. Although armed, their weapons were concealed, and Turnbull was not handcuffed.

The interrogation with Agent Ramnes lasted approximately one hour, during which Turnbull never said he wanted to stop the questioning or take a break. Turnbull also did not show any signs of being under the influence of drugs or alcohol or of having a mental disability. Additionally, Turnbull's answers were coherent and "seemed to fit the question(s)." *Id.* at 47:24. Agent Ramnes testified that he ran a criminal history check on Turnbull during his investigation and discovered that Turnbull had been arrested twice and had been convicted of possession of a controlled substance.

On November 12, 2020, the United States filed a criminal complaint against Turnbull, supported by a 4-page affidavit signed by Agent Ramnes. Turnbull made his initial appearance on even date and was released on bond pending trial. On December 4, 2020, the

Grand Jury returned an indictment against Turnbull, charging one count of possession with intent to distribute marihuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D).

On January 4, 2021, Turnbull filed the instant motion to suppress statements made to CBP officers and HSI agents on the day of his arrest, arguing that his waiver "was not intelligent, knowing, or voluntary," (ECF No. 18 at 2), and his statements were not given voluntarily, *id.* at 3. On January 15, 2021, the United States filed an opposition to Turnbull's motion. (ECF No. 20.)

## II. LEGAL STANDARD

Turnbull contends that his statements made to law enforcement officials were made in violation of his rights under the Fifth Amendment to the U.S. Constitution. The Fifth Amendment provides in relevant part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To safeguard an individual's Fifth Amendment privilege against self-incrimination, the Supreme Court created prophylactic rules through *Miranda v. Arizona*, 384 U.S. 436, 445 (1966), and its progeny that are designed to provide an added measure of protection against the inherently coercive nature of custodial interrogation. Pursuant to *Miranda*, the government may not introduce statements made by an individual who is subject to custodial interrogation unless he first was read his *Miranda* warnings.

Once a suspect under custodial interrogation has been Mirandized, he may waive his rights if his waiver is voluntary, knowing, and intelligent. *Colorado v. Spring*, 479 U.S. 564, 572 (1987); *Miranda*, 384 U.S. at 444. Although "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the

validity of that waiver," *North Carolina v. Butler*, 441 U.S. 369, 370 (1979), the government

has the burden of proof that the following have been established:

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Colorado v. Connelly*, 479 U.S. 157, 170

(1986) ("The voluntariness of a waiver of this privilege has always depended on the absence

of police overreaching, not on 'free choice' in any broader sense of the word.").

Under the Fifth Amendment right against self-incrimination, a defendant's

statements must also be voluntary to be admissible at trial. *See Dickerson v. United States*,

530 U.S. 428, 433 (2000). A statement can be voluntary only when the speaker's "will was

not overborne" and the statement "was the product of an essentially free and unconstrained

choice by its maker, that it was the product of a rational intellect and a free will." *United States*

*v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (internal quotations omitted).

"[C]ourts look to the totality of circumstances to determine whether a confession was

voluntary." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). "[T]he crucial element" of the

inquiry, however, is "police coercion." *Id.* "Unless there is 'police conduct causally related to

the confession,' a confession is considered voluntary. Thus, a court will not hold that a

confession was involuntary unless it finds that it was the product of 'police overreaching.'"

*Swint*, 15 F.3d at 289 (citations omitted) (quoting *Connelly,* 479 U.S. at 164).

### III.   DISCUSSION

**A.   Statements Made by Turnbull in the Presence of Officer Brady**

    **1.   Statements Turnbull Made to Officer Brady During Border Inspection**

In his motion, Turnbull argues that he "was taken into custody by [CBP] agents," "unquestionably 'interrogated' under the relevant definition," and "also unquestionably detained and subjected to a custodial interrogation." (ECF No. 18 at 1-2.) Further, he asserts that "[t]he CBP agents did not read him his rights under *Miranda* before interrogating him." *Id.* at 2.

The Court of Appeals for the Third Circuit has explained that "normal *Miranda* rules are, however, inapplicable to circumstances where border inspectors question persons seeking entry into the United States." *United States v. St. Vallier*, 404 Fed. App'x. 651, 656 (3d Cir. 2010) (citing *United States v. Long Tong Kiam*, 432 F.3d 524, 529-30 (3d Cir. 2006)) (describing the "responsibility of immigration or customs agents to inspect entrants at our borders" and explaining that while persons questioned are undeniably in "custody" . . . "normal *Miranda* rules simply cannot apply to this unique situation at the border").

Border inspectors may ask individuals crossing a United States border any question related to their admissibility or the admissibility of their effects. *See Kiam*, 432 F.3d at 529-30. Moreover, persons seeking to enter the United States may not invoke the right to be silent. *United States v. Gupta*, 183 F.3d 615, 617 (7th Cir. 1999) ("A person seeking entry into the United States does *not* have a right to remain silent; the immigrant must honestly describe his identity, nationality, business, and claim of entitlement to enter, and must do this without the aid of counsel."); *see also Carroll v. United States*, 267 U.S. 154, 154 (1925)

("[N]ational self protection reasonably require[es] one entering the country to identify himself as entitled to come in, and his belongings as effects which may lawfully be brought in.").

Questions bearing on both admissibility and possible criminal activity do not implicate *Miranda*. "Suspicion of criminal conduct cannot overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at our borders." *Kiam*, 432 F.3d at 531. It is only when "the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution . . . [that] this line has been crossed," *id.* at 530, requiring *Miranda* warnings. *United States v. Bailey*, Crim. No. 2020-0005, 2021 U.S. Dist. LEXIS 2930, at *19 (D.V.I. Jan. 7, 2021) (explaining that the officer was not required to read the defendant his *Miranda* warnings before questioning him because the questions asked were "objectively relevant" to the defendant's admissibility). The "fundamental inquiry is whether a customs official's questions 'bear upon both admissibility and criminal conduct, while not relating solely to the prosecution of the latter . . .' If so, the questions are permissible and the answers are admissible." *United States v. Forde*, Criminal No. 2018-0004, 2019 U.S. Dist. LEXIS 3328, at *14 (D.V.I. Jan. 8, 2019) (quoting *St. Vallier*, 404 F. App'x at 657-58).

It is well-established that the United States created a border between the Virgin Islands and the rest of the United States for customs purposes shortly after acquiring the Virgin Islands from Denmark in 1917. As such, for more than one hundred years, Congress has "authorized customs officials to search vessels and goods passing between the Virgin Islands and the rest of the country." *United States v. Hyde*, 37 F.3d 116, 121 (3d Cir. 1994).

Consequently, customs officials at the Cyril E. King Airport in St. Thomas may conduct inspections and searches at their discretion.

Here, Turnbull was selected by CBP agents for inspection upon arrival at the Cyril E. King Airport (an international border). Officer Brady then asked Turnbull questions pertaining to him entering the Virgin Islands and questions pertaining to his effects. Turnbull argues that none of the questions Officer Brady asked were necessary because the officers had information about him in advance, they knew where he was coming from, and they could have assumed the luggage was his because it was in his possession when they encountered him. As such, Turnbull contends that the only purpose of Officer Brady's questions was to develop the prosecution of Turnbull. Turnbull additionally argues that the CBP had advance intelligence that caused the agency to purposefully target him for inspection with the goal of prosecuting Turnbull, disqualifying them for the border exception to *Miranda*.[4]

Turnbull's arguments fail because the inspecting officer's subjective intent and knowledge are immaterial to the analysis. The very goal of customs inspections—including when the CBP has advance notice of potentially criminal activity or discovers inadmissible effects during a random inspection—is to prevent the admission of inadmissible persons and effects. As such, questions objectively related to admissibility, even if the interviewer

---

[4] Turnbull further asserts that all statements he made to CBP Officer Brady should be suppressed even though he was answering admissibility questions because the statements he made were carried forward to Agent Ramnes when the officer and agent discussed Turnbull's inspection. Turnbull provides no support for this argument. As such, this argument is waived. *See Acosta v. Hovensa, LLC*, 529 F. App'x 297, 301 (3d Cir. 2013) ("'[A]n argument consisting of no more than a conclusory assertion . . . (without even a citation to the record) will be deemed waived.'") (quoting *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997)); *Kantz v. University of the V.I.*, Civil No. 2008-0047, 2016 U.S. Dist. LEXIS 65973 at *42 n.21 (D.V.I. May 19, 2016) ("'[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).'") (quoting *United States v. Lanzotti*, 205 F.Ed 951, 957 (7th Cir. 2000)).

suspects an answer may indicate criminal activity, are permissible under the border exception. *St. Vallier*, 404 Fed. App'x at 657 (clarifying "the practical reality that determinations regarding the admissibility of persons or importation of effects often involve[s] an initial assessment of whether a person is engaged in criminal activity"); *Kiam,* 432 F.3d at 531. Only those questions relating solely to prosecution of a potential criminal offense cross the line articulated in *Kiam* and *St. Vallier*: "When an 'inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution' then the inspector is required to administer *Miranda* warnings." *St. Vallier*, 404 Fed. App'x. at 657 (quoting *Kiam*, 432 F.3d at 530).

Because Officer Brady's questioning of Turnbull was related to his admissibility and that of his effects, the Court finds that the border exception applies to all statements Turnbull made to the CBP officers during his interview and luggage inspection. Consequently, *Miranda* is inapplicable for Officer Brady's questions, up to the point at which the officers received the results of the field test confirming the bundles contained marijuana.

### 2. Statements Made by Turnbull During his Phone Call over Speakerphone

Next, Turnbull argues that all statements he made during the phone call on speakerphone in the presence of Officer Brady should be suppressed because the call occurred after Officer Brady found the alleged marijuana in the luggage in his possession. Turnbull alleges he was lured into making the phone call, which was a ploy used by Officer Brady to gather incriminating information. The Government responds that there is no reason that the phone call would be a ploy by the CBP and that there is no evidence to support such an assertion. The Court agrees. Turnbull requested to make a phone call of his own volition

and was not coerced or otherwise influenced by Officer Brady to make the phone call. *Cf.* *Connelly*, 479 U.S. at 170 ("The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word."). Accordingly, Turnbull's motion to suppress the statements he made on the phone is denied.

### 3.   Credibility Determination of CBP Officer Brady

Turnbull argues that the Court must first make a credibility determination with regard to both witnesses before accepting their testimony. Turnbull contends that Officer Brady was not truthful in his testimony, his memory was faulty, and he had little documentation of what transpired with Turnbull's inspection, making his testimony inherently unreliable. The Government counters that there is no evidence that Officer Brady was untruthful—as opposed to not remembering correctly—nor reason to find that there was anything nefarious behind the discrepancies in his recall.

The Court concurs with Turnbull that certain answers Officer Brady provided were inconsistent and his memory as to conversations was incomplete. However, the Court finds Officer Brady testified honestly and corrected his testimony when he became aware of facts that undermined his recollection of events. For example, following review of his inspection report, Officer Brady realized his earlier testimony—that Turnbull was randomly selected for inspection—was incorrect and corrected his previous statement. Moreover, the Court finds that explanations of events made by Officer Brady were generally consistent with those of Agent Ramnes. The witnesses described Turnbull's phone call over the speakerphone similarly, and Officer Brady's recounting of the documented events of the inspection and

transfer of Turnbull to HSI upon discovery of alleged marijuana aligns with Agent Ramnes'

report and testimony. Accordingly, based on an observation of Officer Brady's manner and

demeanor, the fact that his testimony was corroborated by another witness, and in light of

other evidence in this case, the Court finds Officer Brady's testimony to be credible with

respect to the inspection and adherence to protocol. *See United States v. Braddy*, 722 F. App'x

231, 238 (3d Cir. 2017) ("'Indicia of reliability may come from, *inter alia*, the provision of

facts and details, corroboration by or consistency with other evidence or the opportunity for

cross-examination.'") (quoting *United States v. Freeman*, 763 F.3d 322, 337 (3d Cir. 2014)).

## B. Statements Made to HSI Agent Ramnes

### 1. Turnbull Signed the Waiver Voluntarily, Knowingly, and Intelligently

Next, the Court will address whether Turnbull's statements to HSI Agent Ramnes

should be suppressed. The parties do not dispute that Turnbull was under custodial

interrogation during his interview with Agent Ramnes, following some initial biographical

questions. The interrogation took place in the same location as his inspection and customs

interview with Officer Brady. Once again, he was not handcuffed but was also not free to

leave the room. *See United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (defining custody

by physical restraint such that a "reasonable person would perceive that [ ] he was not at

liberty" to leave). Unlike in the border context where questions relate to admissibility and

custody is not dispositive, here Agent Ramnes' questions were designed to elicit inculpatory

responses about alleged criminal activity. As such, the Court agrees with the parties that

Turnbull was under "express questioning or its functional equivalent," *Rhode Island v. Innis*,

446 U.S. 291, 301-02 (1980), during his interview and was therefore under custodial

interrogation.

The Government contends that Turnbull voluntarily waived his right to remain silent. Turnbull, however, argues that "any alleged waiver by Mr. Turnbull was not intelligent, knowing, or voluntary," ECF No. 18 at 2, and argued at the hearing that the waiver form itself was not valid.

Courts look to the first prong of the analysis, voluntariness, by considering traditional indicia of coercion such as: "(1) the duration and conditions of detention; (2) the attitude of the police toward the suspect; (3) the suspect's maturity, education, physical condition and mental state; (4) the suspect's background and experience; and (5) the suspect's prior dealings with the criminal justice system." *Spring*, 479 U.S. at 574; *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (plurality) ("A suspect's background experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry.").

Here, Agent Ramnes' interrogation lasted approximately one hour, following a thirty-to-forty-five-minute wait for the agents to arrive and a one to one-and-a-half-hour interview and inspection with CBP Officer Brady. In all, the duration of Turnbull's inspection and interrogation was approximately three hours in length, of which the interrogation was only about one hour. The Court finds that Turnbull's interrogation was not unreasonable in length. *Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010) (finding that an interrogation of three hours in a "straight-backed chair" was not inherently coercive and emphasizing that "even where interrogations of greater duration were held to be improper, they were accompanied . . . by other facts indicating coercion, such as an incapacitated and sedated

suspect, sleep and food deprivation, and threats").

Turning to Turnbull's physical and mental state, there is neither testimony nor an argument by the defense that Turnbull indicated any physical discomfort, requested to take a break; appeared to be hungry, tired or overwhelmed; or showed mental or emotional anguish. Furthermore, Agent Ramnes testified that there was no indication that Turnbull was under the influence of drugs or alcohol, nor were there any indications that he had a mental disability. As such, the Court finds that Turnbull was not in a distressed mental or physical state at the time he signed the waiver.

Next, the Court looks to the attitude and demeanor of the agents and the demeanor and responses of Turnbull to evaluate possible coercive conduct. Throughout the CBP inspection and the interrogation by Agent Ramnes, the testimony adduced at the hearing indicates that Turnbull was treated respectfully, and that the conversation was polite and cordial. *See Hr'g Tr.* at 47:13-14; 48:2, ECF No. 61. Yet on cross-examination, defense counsel repeatedly asked Agent Ramnes to confirm that he had told Turnbull that he (Agent Ramnes) "would determine whether or not [Turnbull] was going to remain in custody or whether he would be released." *Id.* at 52:1-3. Agent Ramnes sounded confused after each of these questions, responding consistently with, "I'm sorry. You're saying that Mr. Turnbull said that?"; "Uhm, he inquired of me?"; "You're saying that I said that?" *Id.* at 50:15; 51:25; 52:4. Turnbull argues that the Government has not met its burden of showing that the officers and agents did not make promises to Turnbull and thereby coerce him. The Court finds credible Agent Ramnes' testimony that he does not recall ever making such statements to Turnbull. Agent Ramnes also testified that he did not make any threats or promises to Turnbull to

waive his rights and sign the waiver. *See id.* at 46:23-25 – 47:1; *see also id.* at 55:6-20. The Court further finds this testimony credible.

The second prong in the determination of the validity of waiver requires that the suspect have the requisite level of comprehension of the right being waived; in essence, "the capacity to understand the warnings given him, the nature of his Fifth Amendment rights and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

Here, Turnbull was not a minor, and Agent Ramnes testified that he did not show any signs of having a mental disability. He further testified that Turnbull's answers were coherent and appropriate to the questions he was asked. Moreover, Turnbull was not under duress during the interrogation, nor appeared to be under the influence of drugs or alcohol. Consequently, the Court finds that Turnbull had the capacity to understand the rights he was abandoning.

Turnbull additionally questions the validity of the written waiver itself.[5] On direct examination, the Government pointed out an inconsistency in the timestamps that were hand-written on the waiver:

> Q:    Okay. And it—what can you tell me about those times? Do they look accurate in terms of Mr. Turnbull being taken into custody at 3:55 and signing the document prior to that at 3:45?
>
> A:    Those should be the same time. I think that's just a mistake on my part. Normally, what I do is I sit down, I start to fill out the form and, I think—probably what happened was I was distracted answering questions during that time and making sure that I had all the paperwork and

---

[5] Turnbull also asserts that his statements were elicited in violation of his "right to counsel as guaranteed by the . . . Sixth Amendment[ ]." Turnbull does not further address this assertion, nor does he develop the argument in his motion or oral argument. Consequently, the Court will not address this claim. *See Glass v. Saul*, No. 19-cv-1804-RCL, 2021 U.S. Dist. LEXIS 71833, at *19 (D.D.C. Apr. 13, 2021) ("This Court will not address plaintiff's undeveloped constitutional claim."); *Soto v. United States*, Civil Action No. 04-2108 (JAG), 2005 U.S. Dist. LEXIS 28162, at *20 (D.N.J. Nov. 15, 2005) ("This Court need not address the merits of undeveloped and unsupported claims like the instant one.").

forms and the information that I needed . . . .

*Hr'g Tr.* at 46:5-15, ECF No. 61. On cross-examination, the Defense did not inquire into the written waiver, whether on the topic of the timestamps or any other issue. *See id.* at 49:17-25 – 55:1. Yet in closing arguments, Defense argued that the real discrepancy in the written waiver is not the differing times written on the form, but that it appears that there were three different pens used to write the times/date and the various signatures — "and there's no explanation for that." Significantly, Turnbull did not explore this question with Agent Ramnes during cross-exam and thus cannot establish that there is no explanation. Defense counsel chose not to question the Agent about this issue, despite having the opportunity to do so. The Court can imagine a number of legitimate circumstances in which two or three pens could be used for the document and will decline to infer that a lack of an explanation on the record as to the use of multiple pens renders the waiver invalid.

Therefore, in the totality of the circumstances, the Court finds that the agents interviewing Turnbull were generally relaxed, respectful, and neither threatening nor coercive in their conduct and interactions with him. *Milbourne v. Hastings*, No. 13-4821 (JBS), 2017 U.S. Dist. LEXIS 118404, at *38 (D.N.J. July 27, 2017) (finding no police coercion where the officers "were not, in any fashion, threatening" but were "more conversational in nature"). Likewise, there are no allegations or evidence that the officers present in hard secondary treated Turnbull with less respect. The Court also finds that Turnbull possessed the requisite level of comprehension of the nature of the rights he was waiving and the consequences of his decision to abandon those rights.

*United States of America v. Turnbull*
Case No.: 3:20-cr-0046
Memorandum Opinion
Page 19 of 21

Moreover, Agent Ramnes testified that at no time in the interrogation did Turnbull indicate he wanted to stop, and Turnbull does not allege that he invoked his right to counsel or his right to remain silent. As such, his actions comported with his signature on the waiver of rights. The Court concludes that under the totality of the circumstances, Turnbull's relinquishment of his rights under *Miranda* was voluntary and not a product of police coercion. Therefore, because the Court also finds that his waiver was made with sufficient understanding of the rights being abandoned, the Court concludes that Turnbull's waiver of rights was valid.[6]

## 2. Turnbull's Statements Were Made Voluntarily

Lastly, Turnbull contends that "any statements, admissions, or confessions were involuntary and made in violation of the Due Process Clause of the Fifth Amendment." (ECF No. 18 at 3.)

A confession is not voluntary if it was the product of police coercion or overreaching. The Supreme Court has repeatedly held that confessions elicited through lengthy, coercive, interrogations are involuntary. *See Haynes v. Washington*, 373 U.S. 503, 513-14 (1963) (holding the accused's confession involuntary when the officers prevented access to counsel

---

[6] Turnbull argues that there is no proof that Turnbull was read, and waived, his *Miranda* rights before answering questions posed by Agent Ramnes because the interrogation was not recorded. Significantly, federal law does not mandate electronic recording of interviews or interrogations. *See United States v. Tykarsky*, 446 F.3d 458, 477 (3d Cir. 2006) ("Whatever the merits of the policy arguments in favor of requiring the recording of interrogations may be, it is clear that such recording is not mandated by the United States Constitution."); *United States v. Redlightning*, 624 F.3d 1090, 1114 (9th Cir. 2010) (declining to require that interrogations be recorded); *United States v. Boston* 249 Fed. App'x. 807, 810 (11th Cir. 2007) (stating that while such a rule "might be sound policy," the court of appeals "agree[s] with other circuits that have concluded that the Constitution does not require [the court] to adopt such a rule"). The Court is satisfied with the testimony on record that the agents read the waiver form to Turnbull and that Turnbull knowingly, intelligently, and voluntarily waived his rights under *Miranda.*

and interrogated the accused for more than thirty-three hours until he confessed); *Spano v. New York*, 360 U.S. 315, 323-24 (1959) (finding the confession involuntary when elicited from a 25-year old man with a history of emotional instability after an eight-hour interrogation that ended at 3:25 a.m.); *Ashcraft v. Tennessee*, 322 U.S. 143, 153-54 (1944) (finding confession involuntary where multiple officers, attorneys, and investigators continuously interrogated the suspect for thirty-six hours, with no rest or sleep).

Here, the interrogation lasted only about one hour and was not "so prolonged and unremitting . . . as to accomplish extortion of an involuntary confession." *Miller v. Fenton*, 796 F.2d 598, 606 (3d Cir. 1986) (quoting *Stein v. New York*, 346 U.S. 156, 184 (1953)); *see also United States v. Williams*, No. 17-246, 2019 U.S. Dist. LEXIS 83484, at *70-*71 (W.D. Pa. May 17, 2019) (listing cases in which courts have held that interrogations lasting less than one hour to three hours do not, without more, render a statement involuntary).

Considering the totality of the circumstances, the Court does not find that the agents elicited Turnbull's statements by coercion and overbearing of his will. The Court thus finds that Turnbull's claims of coercion are without merit. According to the testimony of Agent Ramnes—which the Court finds to be credible—Turnbull did not request any breaks, nor was he in a distressed mental or physical state at the time of questioning. Thus, in the totality of the circumstances, the Court finds that Turnbull's statements on November 11, 2020, were voluntarily made. *Swint*, 15 F.3d at 289 (holding that a court will not find a confession to be involuntary unless it also finds the statement was the product of police coercion).

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that the CBP inspection and interview were permissible under the border exception to *Miranda*. Accordingly, Turnbull's answers and statements up to the time Agent Ramnes was notified are admissible. The Court further finds that the phone call Turnbull made after his CBP interview was voluntary and therefore admissible. Moreover, the Court finds that Turnbull's waiver of rights was voluntarily, knowingly, and intelligently made and that the statements he made to law enforcement during his interrogation of November 11, 2020, were voluntary and not the product of police coercion or otherwise impermissible tactics. As such, the Court will deny Turnbull's motion to suppress the statements made to CBP officers and HSI agents on November 11, 2020. An appropriate order follows.

**Dated:** January 22, 2022

/s/ Robert A. Molloy
**ROBERT A. MOLLOY**
**Chief Judge**